## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>             **Plaintiff,**<br><br>**v.**<br><br>**PRINCETON ALTERNATIVE FUNDING LLC, MICROBILT CORPORATION, PHILIP N. BURGESS, Jr., WALTER WOJCIECHOWSKI, and JOHN COOK, Jr.,**<br><br>             **Defendants.** | No.<br><br>JURY DEMAND |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") files this Complaint against Defendants Princeton Alternative Funding LLC ("PAF"), Microbilt Corporation ("Microbilt"), Philip N. Burgess, Jr. ("Burgess"), Walter Wojciechowski ("Wojciechowski"), and John "Jack" Cook, Jr. ("Cook") (collectively "Defendants"), and alleges as follows:

## INTRODUCTION

1.     From March 2015 through February 2017 (the "Relevant Period") Defendants solicited investors to buy limited partnership interests in the Princeton Alternative Income Fund, LP ("PAIF") and its offshore feeder fund, Princeton Alternative Income Offshore Fund, Ltd. ("PAIOF") (together with PAIF, the "Fund") through materially false and misleading statements regarding: (1) the management team of PAF; (2) PAF's and Microbilt's ability to monitor the

Fund's investments in real time; (3) the method by which PAF and Microbilt selected investments for the Fund; and (4) the satisfaction and continued investment of the Fund's largest investor.  Defendants, by making, authorizing, disseminating, and otherwise substantially assisting others in making these false and misleading statements, raised more than $73 million for the now-bankrupt Fund.

2.     Defendants' materially false statements and omissions violated the anti-fraud provisions of the federal securities laws, including Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Alternatively, Burgess, Wojciechowski, and Microbilt knowingly or recklessly aided and abetted PAF's and Cook's false statements and omissions, as well as the false statements and omissions of PAF's chief executive officer.

3.     The Commission respectfully requests, among other things, that the Court permanently enjoin Defendants from committing further violations of the federal securities laws as alleged in this Complaint, order Defendants Burgess, Cook, Wojciechowski, and Microbilt to pay civil penalties, permanently enjoin Burgess, Cook, and Wojciechowski from soliciting any person or entity to purchase or sell any security, and order any other appropriate and necessary equitable relief.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)-(e) & 78aa(a), and Sections 20(b)-(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b)-(d) & 77v(a).

5.      Venue is proper in the District of New Jersey pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Among other things, many of the Defendants reside and conduct business in this District and they conducted much of the activity alleged in this Complaint in this District, including soliciting and communicating with investors and operating the Fund.

6.      Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or of the mails, including the use of email, telephone, and the internet in connection with certain of the illegal acts alleged in this Complaint, a number of which occurred within this District.  In addition, Defendants have solicited investors to purchase limited partner interests in the Fund in several states and other countries, including Texas, Illinois, California, the United Kingdom, and Russia.

## DEFENDANTS

7.      **PAF** is a Delaware limited liability company with its principal place of business in Princeton, New Jersey.  PAF was the general partner of PAIF and the investment manager of PAIOF, and was not registered with the Commission as an investment adviser.  On March 9, 2018, PAF filed a voluntary petition for Chapter 11 bankruptcy protection, and the Bankruptcy Court appointed a trustee in November 2018.  The Court confirmed a Chapter 11 Plan on March 31, 2020, pursuant to which Microbilt, together with an advisory committee composed of investors, assisted in the liquidation of PAIF's assets.  The Bankruptcy Court closed the case on May 11, 2021.

8.      **Microbilt** is a Delaware corporation with its principal place of business in Princeton, New Jersey.  Microbilt owned a majority of PAF through a wholly owned subsidiary, Microbilt Financial Services Corporation.  During the Relevant Period, Microbilt's largest

shareholders were Burgess and his immediate family, who owned (under Burgess's control) approximately 48% of its shares through Bristol Investments, LLC ("Bristol") and other entities.

9.      **Burgess**, 58 years old, resides in Princeton, New Jersey.  Burgess owns numerous companies, including Bristol.  Burgess previously served as Microbilt's CEO from April 2000 until he stepped down in January 2007 when he was the target of a criminal investigation.  In October 2008, Burgess pleaded guilty to charges of income tax evasion and failure to pay payroll taxes to the IRS, and was sentenced to eight months in prison.  During the Relevant Period, Burgess served both as a paid "consultant" to Microbilt and in a management role at PAF, which he and other defendants actively sought to conceal from prospective and existing investors.

10.     **Wojciechowski**, 63 years old, resides in Bensalem, Pennsylvania.  He has served as the CEO of Microbilt since January 2007, and later served as Microbilt's chief financial officer ("CFO").  While still serving as CEO and CFO of Microbilt, Wojciechowski served as CFO of PAF beginning in March 2016, an advisor to PAF throughout the Relevant Period, and interim CEO to PAF from January to March 2016.

11.     **Cook**, 54 years old, resides in Princeton, New Jersey.  Starting in March 2016, Cook served as PAF's chief operating officer ("COO") and chief compliance officer ("CCO").  Cook became PAF's CEO in January 2018.  Cook previously held series 3, 7, 24, and 63 licenses.

## OTHER RELEVANT ENTITIES

12.     **PAIF** is a Delaware limited partnership with its principal place of business in Princeton, New Jersey.  PAF was the general partner of PAIF.  PAIF had 10 limited partners, including PAIOF.  PAIF filed a voluntary petition for Chapter 11 bankruptcy protection on

March 9, 2018.  The Bankruptcy Court appointed a trustee in November 2018, confirmed the

Chapter 11 plan on March 31, 2020, and closed the case on August 24, 2020.

13.     **PAIOF** is a British Virgin Islands business company, and is a PAIF feeder fund.

PAF served as the investment manager to PAIOF, which had five shareholders.

14.     **Investor R** is a Delaware limited partnership with its principal place of business

in Dallas, Texas.  Investor R has been registered with the Commission as an investment adviser

since 2013.  During the Relevant Period, Investor R served as the adviser and manager to two

pooled investment vehicles, which collectively invested $6.8 million in PAIF and $55.1 million

in PAIOF, respectively, between March 2015 and February 2016.  Investor R was the largest

investor in the Fund.

15.     **CEO A,** 51 years old, resides in West Orange, New Jersey.  CEO A served as

PAF's CEO from March 2016 to January 2018.

## FACTUAL ALLEGATIONS

**I.      Creation of PAF and the Fund**

16.     Microbilt is a consumer credit reporting company that specializes in subprime

consumer data.  It sells a variety of products and services that it claims help reduce the risk to

companies in the alternative lending industry.  Alternative lenders are companies outside of

traditional banks that provide, among other things, high-risk loans or leases to subprime

consumers (consumers who pose a high risk of defaulting based on their credit history and other

factors).

17.     In 2013, many of Microbilt's customers were alternative lenders that provided

high-risk loans in the "subprime" (high-risk) consumer space.  These loans are often available

online, through non-bank lenders, and come with very high interest rates and frequently have

other onerous terms.  In 2013, many alternative consumer lenders were facing financial challenges—partly because of government investigations into predatory practices in the alternative lending marketplace that focused in part on the relationships between banks and alternative lenders.  Without access to adequate financing, these alternative consumer lenders were issuing fewer loans to consumers.

18.     As a result, leading up to the Relevant Period, Microbilt's revenue also suffered, as alternative lenders and other Microbilt customers bought fewer of Microbilt's products to evaluate the creditworthiness of subprime consumer borrowers.

19.     In order to provide alternative consumer lenders with capital and, in turn, increase Microbilt's revenue, Burgess—after serving his criminal sentence for felony tax fraud and while working as a "consultant" for Microbilt—proposed that Microbilt create a private fund that would invest in the subprime lending market by providing lines of credit to alternative lending consumer finance companies at annual interest rates of approximately 20-24%.  The consumer finance companies, in turn, intended to earn a profit by drawing down money from the lines of credit and lending those funds to subprime (high-risk) borrowers at rates of interest that ranged from 69% to over 700%.

20.     Wojciechowski, Microbilt's CEO, agreed with Burgess's proposal that Microbilt create and operate the private fund.  Burgess's concept for Microbilt's fund required that the consumer finance companies would both: (i) pay to use Microbilt's data products in underwriting the loans they made to subprime borrowers; and (ii) allow Microbilt and its private fund manager to monitor the underlying loans the consumer finance companies made to subprime customers, and thereby monitor the Fund's investments (*i.e.*, the lines of credit it extended to consumer finance companies at high interest rates).

21.     To implement their plan, in August 2014, Microbilt—through the actions of Burgess and Wojciechowski and others—formed PAF to serve as the general partner and manager of the Fund.  On September 30, 2014, Microbilt deposited $10,000 in a PAF bank account, and another investor deposited $5,000 on September 26, 2014.  These deposits constituted PAF's initial funding.

22.     In November 2014, PAF formed PAIF, and it began offering and selling limited partnership interests in PAIF, including shares in its related offshore fund, to individual investors from March 1, 2015, through March 1, 2017.  Most of the investors in the Fund were institutional investors, one of which held about 85% or more of the outstanding equity interests during the Relevant Period.

23.     As manager of the Fund, PAF received a management fee of 1-2% of the Fund's assets under management ("AUM") annually, depending on the investor.  PAF received these fees on a monthly basis in advance based on the value of each limited partner's capital account, as of the first day of the month.  PAF also received an incentive allocation equal to 10-20% of the net income allocated for the year to each limited partner, depending on the investor.

24.     In February 2016, Burgess and Wojciechowski hired Cook, who had no experience in the alternative lending space, to serve as the COO and CCO of PAF.  Burgess and Wojciechowski also hired CEO A to serve as PAF's CEO.  Like Cook, CEO A had no experience in the alternative lending marketplace.

**A.      The Fund's Offering Documents**

25.     The Fund's private placement memorandum ("PPM") stated that the Fund "intends to invest substantially all its assets into organizations which will originate loans in the alternative marketspace."  The PPM stated further that the investment objective of the Fund was

"to provide investors consistent, risk-adjusted returns through direct loans to non-bank

lenders . . . ."

26.     From the start, Burgess and Wojciechowski, who worked on behalf of and under

the control of Microbilt and PAF, arranged for PAF (through Microbilt) to provide two key

services to mitigate the risk of financial loss to the investors (limited partners) in the Fund.  First,

Microbilt and PAF were supposed to engage in a due diligence process to rank alternative

lending consumer finance companies based on their historical performance and thereby enable

the Fund to invest in (by lending money to) the best alternative lending consumer finance

companies.  Second, to minimize the risk to the Fund's capital, Microbilt and PAF were

supposed to provide live monitoring of the loans the consumer finance companies made to the

subprime borrowers.

27.     As an example, Burgess highlighted these very points in a September 20, 2016

email that he wrote to Cook, CEO A, and other PAF employees who solicited investors to

"spread the knowledge" and "build an FAQ book" about Microbilt, PAF, and the Fund.  In the

email, which the recipients later used as talking points with investors (as Burgess intended when

he wrote it), Burgess asserted, "Microbilt provides [the Fund] with a steady client base of

competent operators.  Historically, they have been best operators based on actual performance.

We like to think they are 'good loans' and that these clients originate 'good loans', but Microbilt

provides *us* with the below [the live monitoring] to ensure that our capital is not at risk."

(emphasis added).

28.     Relatedly, the PPM provided that the Fund would enter into contractual

agreements with "Microbilt Corporation . . . and employ **its proprietary evaluation models to

identify, analyze, and monitor those lenders in real time**. . . ." (emphasis added).

8

29.     As designed, Microbilt and its key personnel were integral to the operation of PAF and the Fund.  First, Microbilt was supposed to recommend consumer finance companies to PAF as potential recipients of lines of credit (revolving loans) for the Fund.  Microbilt purportedly would recommend consumer finance companies from its existing client base of consumer finance companies that used its data services.  These preexisting relationships should have allowed Microbilt to: (1) evaluate and rank their previous actual performance in the alternative lending industry; and (2) only recommend the best performing (and thus lowest risk) borrowers to PAF.  As described below, although defendants and their agents repeatedly touted these putative advantages, Microbilt did not employ them in practice during the Relevant Period.

30.     Second, Microbilt's products purportedly allowed PAF to screen the consumers and provide valuable information—"live" and in "real time"—about the underlying consumer loans.  This information included: the financial health of the (subprime or high-risk) borrower; the borrower's ability to repay the loan; whether the repayment of a loan to a consumer borrower had come from the consumer's bank account; and whether the borrower was current on its payments, was near default, or had defaulted, so that Microbilt and PAF could ensure that the consumer loan was replaced with better collateral to secure the credit line.  As described below, while Defendants made contemporaneous representations otherwise, Microbilt did not, in fact, provide live or real time analysis of the high-risk loans that secured the credit lines for much of the Relevant Period.

31.     In addition to stating the Fund's investment strategy and its relationship with Microbilt, investor presentations, the PPM, and other marketing materials also listed the members of PAF's management team.  Initially, these documents represented that management included Original President A as President of PAF and Managing Partner B as Managing

Partner.  Burgess was an acquaintance of both Original President A and Managing Partner B, and he hired them.  Although they both had previous private fund experience, neither of them had experience with alternative lending investments, which formed the basis of the proposed investments of the Fund.

32.     Because they lacked experience in the alternative lending field, Original President A, Managing Partner B, and the rest of the original PAF management team, relied heavily on the deep experience that Burgess, Wojciechowski, and others at Microbilt had in evaluating and selecting credit lines (investments) for the Fund, and creating marketing materials that described Microbilt's alleged "real-time monitoring" capabilities and the diligence and processes that were being performed to select the best consumer finance companies for investment by the Fund.

33.     Burgess had a substantial role in the decision-making and management of PAF but Defendants concealed this information from investors.  By touting PAF's management team in investor presentations, marketing materials, and the PPM, Defendants had an obligation to ensure those statements did not mislead investors.  However, by omitting Burgess's crucial role in PAF's management from these materials, Defendants rendered the statements of who participated in PAF's management team false and misleading.  These omissions further acted to conceal Burgess's criminal conviction.  Defendants knew that fraud is a primary risk throughout the alternative consumer lending industry and, therefore, Defendants knew, were reckless in not knowing, or should have known that misrepresenting the management team of PAF and omitting Burgess would have been material to investors' decisions about whether to commit capital to the Fund.

34.     In January 2016, at Burgess's direction, Wojciechowski fired Original President A and Managing Partner B.  From January 4, 2016, until March 2016, Burgess and

Wojciechowski managed the Fund.  During this time, Burgess and Wojciechowski took no steps to update the PPM and marketing materials to reflect this change in management.

35.     The investor presentations, marketing materials, and the PPM were updated in March 2016 by Cook, shortly after he was hired, to include the names and management positions for Cook, CEO A, and Wojciechowski.  Defendants Burgess and Wojciechowski each reviewed and approved these materials for dissemination to investors, and Cook took a primary role in drafting updates to the investor presentation.  The updates to these marketing materials, however, still misrepresented the members of the PAF management team by failing to disclose Burgess's substantial role in the management of PAF and the Fund.

36.     The omission of Burgess from these materials was particularly important because neither Cook nor CEO A had any previous experience in the alternative consumer lending markets and both relied upon Burgess's expertise in operating PAF and the Fund.

## II.     Defendants materially misrepresented the members of the management team and risk reduction features of the Fund to existing and prospective investors.

### A.     Defendants materially misrepresented and concealed Burgess's significant role in managing PAF and the Fund.

37.     During the Relevant Period, Defendants Burgess and Wojciechowski, working on behalf of and under the direction of Microbilt and PAF, and Cook, working on behalf of and under the direction of PAF, knowingly, recklessly, or negligently made and/or disseminated materially false statements to investors and potential investors that misrepresented the management of the Fund and concealed the significant role that Burgess, who had recently been convicted of tax fraud, played in managing both PAF and the Fund.  Investor presentations, the PPM, and other marketing materials and public statements never included Burgess in the management team or advisory board for PAF.  The same materials disclosed lesser employees,

11

including one employee as an advisory board member whose role was limited to formatting PowerPoint presentations and making trade show banners, and another who did not know that he was even on the advisory board.

38.     Burgess and Wojciechowski sought to conceal Burgess's role from the outset. Burgess, in a series of emails on January 2-4, 2015, instructed Wojciechowski how to respond to a reporter who had been inquiring about whether Burgess was involved in the Fund.  On January 4, 2015, Wojciechowski sent an email to the reporter falsely claiming that Burgess was only a "consultant."  Specifically, Wojciechowski deceptively asserted, "Phil is not involved in the operations and he is a [sic] purely a consultant to the company that primarily works on product development.  His LinkedIn profile is out of date and *he really is not involved in PAF*." (emphasis added).  Significantly, Wojciechowski's false description of Burgess's role was word-for-word what Burgess had instructed him to say.

39.     Similarly, on January 6, 2016, while he was actively managing PAF, Burgess emailed a presentation about PAF and the Fund to a potential investor that failed to disclose Burgess's involvement with the Fund, let alone that he was as a member of the management team.

40.     Cook drafted investor presentations and tear sheets (single-paged documents that are used to summarize key information about individual companies or funds), and both Wojciechowski and Burgess reviewed and approved them for dissemination knowing that PAF employees would (and did) routinely email them to numerous potential and existing investors throughout 2016 and 2017.  All of the investor presentations and tear sheets misrepresented the composition of the PAF management team by omitting Burgess's name—and thereby any indication of his criminal history—from any description of the management team.

41.     For example, on June 21 and October 12, 2016, and February 1, 2017, Cook emailed an investor presentation about PAF and the Fund to different potential investors that failed to mention Burgess in any manner, including in the description of PAF's management team and advisory board.

42.     These representations and omissions about the composition of PAF's and the Fund's management team were false and misleading because Burgess:

     a.  controlled all management decisions at the Fund;

     b.  created management and operations policies for the Fund;

     c.  reviewed potential consumer credit companies and reviewed their loan portfolios;

     d.  sat on the credit committee and exercised substantial influence over decisions about which consumer credit companies the Fund would extend credit, *i.e.* invest;

     e.  had the authority to hire and fire members of PAF's management—an authority he exercised on more than one occasion; and

     f.  negotiated and set pay and benefits for members of the PAF management team and its employees.

43.     Despite describing himself only as a "consultant" for Microbilt, and not having any *formal* role in Fund management, there is no question Burgess was intimately involved in managing the Fund, including how to conceal his role in the Fund, identifying and selecting the Fund's investments, and identifying the Fund's risk mitigation tools.

44.     For instance, in an email conversation between Burgess, Wojciechowski, Cook, and others on January 29, 2017, Burgess instructed Cook, CEO A, and Wojciechowski how and when to disclose the nature of PAF's access to financial data and loan information.  In the email conversation, Burgess instructed Cook, Wojciechowski, and another PAF employee, to be less

transparent with investors about the Fund's (lack of) access to the type of data the Fund claimed

that it used to mitigate risk.  To that end, Burgess instructed them to "[b]e careful with too much

transparency as it will bite you in the ass."  He later added, "I am also NOT suggesting you lie,

but don't volunteer unless you are ask[ed] the direct question."  He then noted his apparent belief

that "[y]ou cannot trust anyone, period, and good deeds do not go unpunished.  He [the investor]

will jerk you around on future investments, just to continue to get info out of you."  To

underscore his concern, Burgess added, "I will bet you my left nut (and I like my nuts) that this

[investor] comes after us and uses your words to get us.  Don't let that happen."  Less than a

minute after sending this email, Burgess replied to all with a single sentence stating, "Also,

delete these emails please."

      45.    Burgess also conducted himself as if he controlled and owned PAF (albeit not

publicly, or to investors or prospective investors) and he made clear to Cook, Wojciechowski,

CEO A, and others at PAF that: (1) he controlled the Fund; (2) it was being run using "his

money," and (3) that they could not make decisions about "his money" without his approval.  In

the same January 29, 2017 email conversation, Burgess told Cook, Wojciechowski, and others:

> Right now I am putting 100% of the money up for this venture.  When you
> offer to waive fees or cut fees, that is my money.  I would be 100%
> supportive if you gave up the money you are getting, as part of those type
> offerings, but if you are not offering the money you are getting as part of the
> deal, I do not support them at all.  It is unfair you [sic], to me, to offer up my
> continued financial support without discussing it with me.  That is not
> making business decisions about the fund on your own, it is spending my
> money, without my approval.

      46.    Additionally, on February 16, 2016, during a discussion with an industry

representative about PAF's position with Consumer Finance Company A, Burgess even told the

industry representative that he "owned" PAF.

47.     Cook, Wojciechowski, and others knew of Burgess's significant role.  For example, Cook admitted under oath that PAF "really relied on [Burgess's] expertise" and opinions, and Burgess had influence over the Fund, as Burgess was "the guy" who knew the consumer lending market and Microbilt.  Similarly, Wojciechowski admitted that Burgess was "involved" with PAF and that Burgess participated in PAF management meetings and decisions regarding certain credit lines.

48.     Despite his expertise in the industry, PAF's reliance on that expertise, and his ability to influence and control the decisions of PAF and the Fund, Burgess's name never appeared in the Fund's marketing materials such as investor presentations, the PPMs, and tear sheets (which Cook drafted and reviewed and Burgess and Wojciechowski approved).  Defendants knew these marketing materials would be and were routinely emailed or otherwise disseminated by PAF employees, including Cook, to numerous potential and existing investors throughout 2016 and 2017.

49.     At all relevant times, Burgess, Cook, and Wojciechowski knew of Burgess's prior criminal conviction and incarceration for tax fraud.  At all relevant times, Burgess, Cook, and Wojciechowski knew, were reckless in not knowing, or should have known that representations concerning PAF's management were false and misleading because Burgess's name and the nature of his involvement were not disclosed in the Fund's investor presentations, the PPM (both of which Cook and PAF employees routinely disseminated and presented to existing and potential investors), and the above referenced statements to investors and potential investors.

50.     Information about the management of a fund is material information to investors who are making investment decisions.  Such information was particularly important in this case as failing to identify Burgess also concealed that a member of the management team was a felon,

who had been convicted of fraud charges and spent time in prison; this was critical information that any reasonable investor would have wanted to know before investing in the Fund. Burgess, Cook, and Wojciechowski knew, were reckless in not knowing, or should have known that Burgess's participation in the management of PAF and the Fund's investments and his criminal conviction and incarceration for tax fraud were material to investors' decisions whether to invest in the Fund.

51.     Despite this, Microbilt, PAF, and Cook, acting on behalf of and under the control of PAF, and Burgess and Wojciechowski, acting on behalf of and under the control of Microbilt and PAF, repeatedly and continually misrepresented the identity of who was managing PAF by omitting the key information regarding Burgess's active participation in the management of PAF and the Fund's investments when making statements, to or otherwise communicating with, investors and potential investors.

52.     Burgess, Wojciechowski, and Microbilt, with knowledge or in reckless disregard of the fraudulent activity described above, provided substantial assistance to Cook's and PAF's failure to inform investors of Burgess's participation in the Fund by reviewing and approving material misstatements (as described in detail above) that Burgess, Wojciechowski, and Microbilt knew, or were reckless and not knowing, would be sent to investors.

**B.      Defendants materially misrepresented to investors that the Fund had the ability to reduce investment risk by tracking investments in "real time."**

53.     During the Relevant Period, Burgess and Wojciechowski, working on behalf of and under the direction of Microbilt and PAF, and Cook, working on behalf of and under the direction of PAF, knowingly, recklessly, or negligently made and/or disseminated materially false statements to investors and potential investors that the Fund had consistent "real-time"

access to monitoring systems that would evaluate the consumer finance company lenders and the subprime borrowers to reduce the risk of loss to the Fund.

54.     One of those systems was the Loan Management System ("LMS"), a computer database system that the consumer finance companies use to maintain each borrower's key information, such as the terms of each loan, opening balances, and payments (or delinquencies), among other information.  Another system was transaction logs, or "T-Logs" that comprised data that Microbilt received from third-party payment processors.  Further, Defendants represented that they had the ability to pull bank account transaction details and data on the subprime borrowers that allowed Defendants to see the payments and sources of payments to the consumer finance companies, and thereby mitigate the risk of fraud and nonpayment.

55.     The putative ability of Microbilt and PAF to analyze bank account transaction details and data about the consumer finance companies' loans to subprime borrowers "live" or in "real-time," rather than on a monthly or other lengthier periodic or episodic basis, if at all, was a key selling feature that Defendants used to solicit investors in the Fund.  Defendants touted the partnership between Microbilt (which was supposed to provide the live monitoring systems) and PAF as a "model that allows micro [sic] tracking of the individual loans."  These representations were materially false and misleading.  Had the technology existed as Defendants advertised, the arrangement could have given PAF a competitive advantage because it would have, for instance, provided constant insight into how the individual subprime borrowers were performing on their loans and, thus, reduced the risk to investors in the Fund.

56.     For example, on June 21, 2016, Cook emailed a PAF investor presentation to Investor X that falsely stated that, "[u]tilizing historical and real-time data analytics, Princeton

Alternative Funding seeks to fill that void by providing and managing credit facilities while targeting the highest quality finance companies that face U.S. consumers."

57.     In a September 2016 telephone call with Investor Y, Cook and CEO A represented that PAF had access to the consumer finance companies' loan management systems and could look at the underlying portfolios on a daily basis, despite the fact that they knew such access did not exist for the majority of the Fund's invested capital.  Burgess and Wojciechowski provided the false information to Cook and CEO A, and controlled its dissemination during the pitch to Investor Y.

58.     On October 11, 2016, Cook, Wojciechowski, and CEO A met with Investor Y and described to Investor Y some of the real-time monitoring systems that Defendants used to monitor investments, including products used to monitor bank accounts and transactions.

59.     On October 12, 2016, and February 1, 2017, Cook emailed Investor Y and another investor a similar investor presentation.  This investor presentation asserted that regulatory changes had made it harder for consumer finance companies to borrow money from traditional banks, and that this, in turn, made it "harder for millions of U.S. consumers to get access to loans."  The presentation also stated that, "[u]tilizing historical and real-time data analytics, Princeton Alternative Funding seeks to fill that void by providing and managing credit facilities while targeting the highest quality finance companies that face U.S. consumers" and, "Princeton Alternative Funding's strategic partnership with Microbilt provides . . . World-class analytics" and "[b]est in class monitoring capabilities with real-time feeds."  Investor Y invested in the Fund on December 1, 2016.

60.     The statements Cook, Wojciechowski, and CEO A made and disseminated to investors were false because they claimed that PAF was monitoring the Fund's investments on a

real-time basis to reduce the risk of the subprime lending market to the Fund.  On the dates that Cook, Wojciechowski, and CEO A made statements, and when Cook disseminated these statements, PAF did not have access to "real-time" data analytics for a majority of the Fund's invested capital.  The Fund did not have the consistent capability to monitor the loans on a daily basis or in "real time," and had not done so since the inception of the Fund.

61.     Cook, Wojciechowski, and CEO A knew, were reckless in not knowing, or should have known that these statements were false at the time they made them and Cook disseminated them.  Cook was responsible for credit monitoring starting in 2016-2017.  Cook, Wojciechowski, and CEO A knew that from at least August 2016 through at least December 2016, PAF and the Fund could not monitor, either completely or in part, the financial performance of Consumer Finance Companies A, B, and C.  When Cook emailed investor presentations, and when Cook, Wojciechowski, and CEO A spoke with potential investors in September or October 2016, falsely stating that PAF and the Fund had real-time monitoring, they knew, were reckless in not knowing, or should have known that Microbilt and PAF could not monitor, in real time, the performance of the Fund's credit lines.

62.     During this same period, Burgess, as an agent of Microbilt and PAF, was also providing PAF employees with false information about the "real-time" capabilities and monitoring of the consumer finance companies.  On September 20, 2016, Burgess wrote an email to PAF employees that he authorized them to use to answer inquiries from potential investors.  In that email Burgess wrote, "Microbilt also provides live monitoring as the lenders are required to report to Microbilt . . . .  Further, Microbilt provides us with tools that allow [the Fund] to pull transaction detail for all bank accounts, general ledger, payroll & the Loan Management System, daily. . . .  We have access to the raw data & backup data 24 x 7."  A PAF

employee used Burgess's statement word-for-word when communicating with potential investors on September 21 and 22, 2016.

63.     Burgess's statements were false.  PAF, the Fund, and Microbilt did not have consistent real-time access to the consumer finance companies' systems and data.  Burgess knew that as of at least May 4, 2015—when the Fund already had issued three lines of credit (*i.e.*, three investments with consumer finance companies)—when he informed the Fund and PAF management that the Fund, PAF, and Microbilt, did not have real-time monitoring and that it would take Microbilt, PAF, and the Fund "*another few months to finish that*."  (emphasis added). Thus, as of May 2015, although the Fund was already extending lines of credit to consumer finance companies and actively soliciting investors for the Fund, PAF and Microbilt did not have "live" or "real-time" monitoring, and did not even suggest that they expected to for at least "another few months."

64.     Microbilt's and PAF's ability to monitor data in "real time" did not significantly improve over time.  For example:

    a.  PAIF extended a line of credit to Consumer Finance Company B on November 19, 2015.  By October 2016, PAF still lacked access to Consumer Finance Company B's LMS system, when Cook, on October 10, 2016, contacted Consumer Finance Company B to request access to it.

    b.  PAIF extended a line of credit to Consumer Finance Company C on August 28, 2015.  On October 10, 2016, Cook informed Consumer Finance Company C that PAF and the Fund still lacked access to Consumer Finance Company C's LMS system.

c.  PAIF extended a line of credit to Consumer Finance Company A on May 1, 2015. Consumer Finance Company A was the Fund's largest consumer finance company (meaning that Consumer Finance Company A borrowed and owed the most money to the Fund compared to all of the Fund's other credit line investments).  From at least September 2016—when Cook sent an email requesting access to Consumer Finance Company A's LMS—through at least December 2016, PAF lost access to Consumer Finance Company A's financial reporting, and it was unaware of Consumer Finance Company A's financial condition during at least a four-month period.

65.     In September 2016, when Burgess wrote emails that he authorized and knew PAF employees would send to potential investors, Burgess knew, was reckless in not knowing, or should have known that PAF could not monitor, in real time, the performance of the Fund's credit lines.  He had attended weekly team meetings during this period, when Microbilt's inability to access the LMS and T-Logs were discussed.  Burgess also received and sent emails relating to requests to restore access to the consumer financial companies' loan management systems.

66.     PAF's as well as Cook's, CEO A's, Wojciechowski's, and Burgess's statements regarding the ability of PAF, Microbilt, and the Fund to monitor lenders' financial data in "real time" were material to investors' decision about whether to invest in the Fund because any reasonable investor would have wanted to know that the Fund's investments were *not* being carefully monitored "in real time" to reduce the inherent risk in the alternative (higher-risk) lending space.  During the Relevant Period, Cook, CEO A, Wojciechowski, and Burgess's were acting on behalf of and under the control of PAF.

21

67.     Burgess and Wojciechowski, acting on behalf of and under the control of Microbilt, with knowledge or in reckless disregard of the fraudulent activity described in the preceding paragraphs, provided substantial assistance to Cook's, CEO A's, and PAF's material misstatements that PAF could monitor lenders' financial performance in real time by reviewing and approving material misstatements (which Burgess knew, or was reckless in not knowing, would be sent to investors).

68.     Microbilt, with knowledge, or in reckless disregard of Burgess's and Wojciechowski's misconduct, provided substantial assistance to Cook's, CEO A's, Burgess's, and PAF's material misstatements that PAF could monitor lenders' financial performance in real time.

**C.     Defendants materially misrepresented the process they employed to select "the best operators in the alternative lending sector" to reduce risk in the Fund's investments.**

69.     During the Relevant Period, Burgess and Wojciechowski, working on behalf of and under the direction of Microbilt and PAF, and Cook, working on behalf of and under the direction of PAF, knowingly, recklessly, or negligently made and/or disseminated materially false statements to investors and potential investors that PAF management used Microbilt's "historical rankings" to select only the best consumer finance companies in which to invest or extend credit lines.

70.     In investor presentations used in 2015, 2016, and 2017, PAF falsely claimed to investors that it would review its ranking of subprime consumer finance company lenders generated from Microbilt's extensive database on the actual historical performance of these operators and provide credit lines to those lenders that were the best operators based on actual

performance in the alternative lending space.  PAF further represented that this review and ranking would lower the risk to investors in the Fund.  For example:

    a.    Cook drafted, reviewed. and approved for distribution an investor presentation that falsely stated, "Princeton Alternative Funding's strategic partnership with Microbilt provides . . . World-class analytics and unmatched lender [consumer finance company] due-diligence" as well as "Historical rankings of best operators in the alternative lending sector." On June 21, 2016, Cook emailed PAF's investor presentation that contained this language to Investor X.

    b.    On September 13, 2016, Cook and CEO A told Investor Y that Microbilt had 10,000 customers, of which 4,000 were lenders.  Of these 4,000 lenders, Microbilt picked about 450 to be the top operators in the space. Microbilt referred these lenders to PAF.

    c.    During an October 11, 2016 in-person meeting with Investor Y, Cook, Wojciechowski, and CEO A falsely told Investor Y that PAF's biggest consumer finance company was one of Microbilt's "best operators" and that Microbilt had had a relationship with the company for many years.

    d.    On February 1, 2017, Cook emailed the investor presentation quoted above in Paragraph 70.a to another potential investor.

71.    Burgess also wrote emails that he authorized and directed PAF employees to send to potential investors that falsely represented that PAF used "historical rankings" in the consumer finance company selection process.  According to September 20 and 22, 2016 emails that Burgess wrote to a PAF employee, who sent them by email to a prospective investor: "Microbilt provides

PAIF with a steady client base of competent operators.  Historically, they have been best operators based on actual performance" and "[y]ou will not find another investment manage[r] that has a stronger competitive advantage.  No one comes close to having the pool of lenders and the tools necessary to protect our investors' capital."

72.     Contrary to these statements and representations that Cook, Burgess, CEO A, and Wojciechowski drafted, authorized for distribution, made, and disseminated on behalf of and under the control of Microbilt and PAF, to investors and potential investors, Microbilt did not employ "historical rankings" based on actual performance to determine the "best operators in the alternative lending sector" in its selection and screening process for the Fund's credit lines to consumer finance companies.  In reality, PAF's selection of consumer finance lenders was haphazard at best, and some of the lenders that PAF selected were neither "historically ranked" (or ranked at all for that matter), nor were some even existing clients of Microbilt.

73.     Only once, in 2014, did Microbilt rank its clients at all.  Using November 2014 data, a Microbilt employee examined 418 Microbilt accounts that used short-term lending products (out of 4,374 total clients, the remainder of which did not use short-term lending products) and ranked them on a variety of factors.  Only 57 of 418 clients had data for reported loans and a recorded bad credit rating (the percentage of accounts that perform in an unacceptable manner).  Of those 57, only two became lenders of the Fund's eventual 12 credit lines.  Moreover, contrary to CEO A's, Burgess's, Cook's, and Wojciechowski's assertions, many of the consumer finance company lenders in which the Fund invested either were poorly rated by this 2014 internal ranking or were not even long-term clients of Microbilt.

74.     During the Relevant Period, Wojciechowski, the CEO of Microbilt and CFO of PAF, did not know whether Microbilt had ever performed *any* analysis that could conceivably have generated "historical rankings" of the "best operators in the alternative lending sector."

75.     Cook, as PAF's COO, CCO, and CEO A at PAF, as members of the credit committee that selected the credit lines, knew, were reckless in not knowing, or should have known that—because they did not exist— PAF could not have relied on historical rankings of the best operators in the alternative lending sector in deciding in which alternative consumer lenders to invest the Fund's capital.  Given both Cook's and CEO A's inexperience with both the alternative consumer lending industry and the services Microbilt could provide, Burgess and Wojciechowski, as agents of Microbilt, were the source of the false information that Cook prepared and provided to investors.  Burgess and Wojciechowski knew, were reckless in not knowing, or should have known that the information that they provided to Cook and CEO A was false and that they would in turn provide the false information to potential investors or investors in the Fund.

76.     Cook and CEO A, acting on behalf of and under the control of PAF, and Wojciechowski, acting on behalf of and under the control of PAF and Microbilt, knew, were reckless in not knowing, or should have known that PAF did *not* have current consumer finance company rankings provided by Microbilt (that would have supported that PAF and the Fund invested in only those lenders that were best in class) when: (i) Cook emailed investor presentations to existing and prospective investors; and (ii) Cook and Wojciechowski spoke with potential investors in September and October 2016, stating that PAF and the Fund only invested in "historically ranked" lenders.

77.     In September 2016, when he drafted emails that he knew PAF employees would send to potential investors, Burgess, acting on behalf of and under the control of PAF and Microbilt—based on his years of experience in the industry and his roles with Microbilt and PAF—knew, was reckless in not knowing, or should have known that PAF did not have current consumer finance company rankings from Microbilt that showed that PAF and the Fund invested in only those lenders that were "best operators based on actual performance" in the alternative lending sector.

78.     Defendants' statements regarding the historical rankings and quality of the lenders that the Fund invested in were material to investors' decisions about whether to invest in the Fund.  The alternative lending marketplace is very risky, both in terms of fraud and credit risk. PAF's and Microbilt's ability to review the actual historical performance of several thousand consumer lenders and rank them based on such performance would have mitigated the risk to Fund investors.

79.     Burgess, Cook, CEO A, and Wojciechowski, acting on behalf of and under the control of PAF and Microbilt, knowingly, recklessly, or negligently, materially misrepresented that PAF's investments consisted of lenders that were "historically rank[ed as] best operators in the alternative lending sector."

80.     Burgess and Wojciechowski, acting on behalf of and under the control of PAF and Microbilt, with knowledge or in reckless disregard of the false statements, provided substantial assistance to Cook's, CEO A's, and PAF's material misstatements that the Fund's investments consisted of lenders that were "historically rank[ed as] best operators in the alternative lending sector" by reviewing and approving those material misstatements that Burgess and Wojciechowski knew, or were reckless in not knowing, would be sent to investors.

81.   Microbilt, through Burgess's and Wojciechowski's fraudulent practices, with knowledge or reckless or negligent disregard of Burgess's misconduct, provided substantial assistance to Cook's, CEO A's, and PAF's material misstatements regarding the due diligence PAF used to select lenders and the manner in which PAF described those lenders to investors.

**D.   Defendant Cook made material misstatements and omissions to investors regarding the Fund's largest investor.**

82.   From the Fund's inception until March 2016, Investor R was the Fund's first, and only, investor.  Throughout the lifetime of the Fund, Investor R's contributions always constituted the largest investment in the Fund, amounting to no less than 85% of the Fund's AUM.

83.   Because of Investor R's outsized investment, a decision to redeem its investment would have had a significant, negative impact on the financial viability of Fund.  Thus, in deciding whether to invest, some prospective investors inquired about the status of both Investor R's investment and its overall relationship with PAF's management.  Cook, acting for and under the control of PAF, provided materially false responses to those investors.  For example:

a.   In a July 18, 2016 email discussion Investor X asked Cook about Investor R's redemption terms, noting their "concern of [the Fund's] business viability if one day they decide to redeem."  Rather than disclose the truth, that Investor R had *already* submitted a redemption request, Cook instead responded deceptively that the Fund had "been in discussions with [Investor R] for an additional investment."

b.   In a January 19, 2017 email responding to a potential investor's question regarding redemptions, Cook disclosed the redemption of a small investor

(approximately $1.5 million) but failed to mention any redemption requests submitted by Investor R.

84.     Defendant Cook's statements and omissions were false and misleading.  On March 28, 2016, four months before the first investor inquiry, Investor R submitted a redemption request after discovering tax and accounting issues created by the structure of the Fund.  Under the terms of the limited partnership agreement, as amended by a side letter agreement, Investor R's redemption would have been effective no later than September 30, 2016, with Investor R receiving 100% of its funds by October 31, 2016.  At no point did Investor R rescind its redemption request.

85.     At least by May 2, 2016, if not earlier, Cook was aware that Investor R sought to redeem its investment.  Cook attended weekly PAF management team meetings that included discussions of Investor R's redemption no later than May 2, 2016.

86.     Cook and PAF knowingly, recklessly, or negligently made material misrepresentations and omissions regarding Investor R's efforts to seek redemption from the Fund.

87.     In total, from March 2015 through February 2017, Cook, Burgess, Wojciechowski, PAF, and Microbilt used the false and misleading statements to raise $73 million from fourteen investors.

## FIRST CLAIM FOR RELIEF

**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
(Against Cook, Burgess, Wojciechowski, PAF, and Microbilt)

88.     Paragraphs 1 through 87 are re-alleged and incorporated by reference herein.

89.     Since at least March 2015, specifically by failing to inform investors and potential investors of Burgess's involvement in the Fund and reviewing, authorizing, making, and

28

disseminating material misrepresentations and omissions concerning important risk reduction strategies in place at the Fund to investors and the status of the Fund's largest investor, Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (1) employed one or more devices, schemes, or artifices to defraud, (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

90.    By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

**Violations of Securities Act Sections 17(a)(1) & (3)**
(Against Cook, Burgess, Wojciechowski, and Microbilt)

91.    Paragraphs 1 through 87 are re-alleged and incorporated by reference herein.

92.    Since at least March 2015, specifically by failing to inform investors and potential investors of Burgess's involvement in the Fund and reviewing, authorizing, making, and disseminating material misrepresentations and omissions concerning important risk reduction strategies in place at the Fund to investors and the status of the Fund's largest investor, Cook, Burgess, Wojciechowski, and Microbilt, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more

29

devices, schemes or artifices to defraud, and/or (3) knowingly, recklessly, or negligently have

engaged in one or more transactions, practices, or courses of business which operated or would

operate as a fraud or deceit upon the purchaser.

93.     By reason of the foregoing, Cook, Burgess, Wojciechowski, and Microbilt

violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) & (3) of

the Securities Act, 15 U.S.C. §§ 77q(a).

### THIRD CLAIM FOR RELIEF

**Violations of Section 17(a)**
(Against PAF)

94.     Paragraphs 1 through 87 are re-alleged and incorporated by reference herein.

95.     Since at least March 2015, specifically by failing to inform investors and potential

investors of Burgess's involvement in the Fund and reviewing, authorizing, making, and

disseminating material misrepresentations and omissions concerning important risk reduction

strategies in place at the Fund to investors and the status of the Fund's largest investor, PAF,

directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the

means or instruments of transportation or communication in interstate commerce or the mails, (1)

knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2)

knowingly, recklessly, or negligently, to obtain money or property by means of any untrue

statement of a material fact or any omission of a material fact necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading,

and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions,

practices, or courses of business which operated or would operate as a fraud or deceit upon the

purchaser.

96.     By reason of the foregoing, PAF violated and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Exchange Act
Section 10(b) and Rule 10b-5 Thereunder**
(Against Burgess, Wojciechowski, and Microbilt)

97.     Paragraphs 1 through 87 are re-alleged and incorporated by reference herein.

98.     By engaging in the conduct alleged in this Complaint, specifically by failing to inform investors and potential investors of Burgess's involvement in the Fund and making material misrepresentations and omissions concerning important risk reduction strategies in place at the Fund to investors and the status of the Fund's largest investor, Cook, CEO A, and PAF directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (1) employed one or more devices, schemes, or artifices to defraud, (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

99.     Burgess, Wojciechowski, and Microbilt knew, or were reckless in not knowing, that Cook, CEO A, and PAF were engaged in the unlawful conduct alleged in this Complaint, and Burgess, Wojciechowski, and Microbilt knowingly or recklessly substantially assisted and participated in the wrongdoing.  Burgess, Wojciechowski, and Microbilt provided substantial assistance to Cook, CEO A, and PAF and substantially participated in the fraud by effecting some of the material misstatements and omissions alleged in this Complaint and reviewing and

approving material misstatements and omissions that Burgess, Wojciechowski, and Microbilt
knew would be sent to investors.

100.     By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act, 15
U.S.C. § 78t(e), Burgess, Wojciechowski, and Microbilt aided and abetted Cook's, CEO A's,
and PAF's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5
thereunder, 17 C.F.R. § 240.10b-5.

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Securities Act Section 17(a)
(Against Burgess, Wojciechowski, and Microbilt)

101.     Paragraphs 1 through 87 are re-alleged and incorporated by reference herein.

102.     By engaging in the conduct alleged in this Complaint, specifically by failing to
inform investors and potential investors of Burgess's involvement in the Fund and making
material misrepresentations and omissions concerning important risk reduction strategies in place
at the Fund and the status of the Fund's largest investor Cook and CEO A, directly or indirectly,
singly or in concert, in the offer or sale of securities and by the use of the means or instruments
of transportation or communication in interstate commerce or the mails, (1) knowingly or
recklessly have employed one or more devices, schemes or artifices to defraud, and/or (3)
knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or
courses of business which operated or would operate as a fraud or deceit upon the purchaser.

103.     By engaging in the conduct alleged in this Complaint, specifically by failing to
inform investors and potential investors of Burgess's involvement in the Fund and making
material misrepresentations and omissions concerning important risk reduction strategies in place
at the Fund and the status of the Fund's largest investor, PAF directly or indirectly, singly or in
concert, in the offer or sale of securities and by the use of the means or instruments of

transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly

has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or

negligently, to obtain money or property by means of any untrue statement of a material fact or

any omission of a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or

negligently has engaged in one or more transactions, practices, or courses of business which

operated or would operate as a fraud or deceit upon the purchaser.

104.    Burgess, Wojciechowski, and Microbilt knew, were reckless in not knowing, or

should have known, that Cook, CEO A, and PAF were engaged in the unlawful conduct alleged

in this Complaint.  Burgess, Wojciechowski, and Microbilt provided substantial assistance to

Cook, CEO A, and PAF and substantially participated in the fraud by effecting some of the

material misstatements and omissions alleged in this Complaint and reviewing and approving

material misstatements and omissions that Burgess, Wojciechowski, and Microbilt knew would

be sent to investors.

105.    By reason of the foregoing, pursuant to Section 15(b) of the Securities Act, 15

U.S.C. § 77o(b), Burgess, Wojciechowski, and Microbilt aided and abetted Cook's, CEO A's,

and PAF's violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

## I.

Issue a Final Judgment permanently restraining and enjoining: (1) all Defendants, their

agents, servants, employees and attorneys and other persons in active concert or participation

with them who receive actual notice of the injunction by personal service or otherwise from (i)

violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and (ii) violating Section 10(b) of the Exchange Act, [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Issue a Final Judgment directing Burgess, Wojciechowski, Cook, and Microbilt to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## III.

Issue a Final Judgment permanently restraining and enjoining Burgess, Wojciechowski, and Cook from, directly or indirectly, including, but not limited to, through any entity owned or controlled by them, soliciting any person or entity to purchase or sell any security, provided, however, that such injunction shall not prevent Burgess, Wojciechowski, and Cook from purchasing or selling securities for their own personal accounts.

## IV.

Grant such further relief as the Court may deem just and appropriate for the benefit of investors.

## <u>DEMAND FOR A JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury in this action of all issues so triable.

Dated: June 24, 2021                    Respectfully submitted,


<u>/s/ James E. Smith                            </u>
James Smith
Joshua Braunstein
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, NE
Washington, DC  20549
Tel: (202) 551-5881 (Smith)
Tel:  (202) 551-8470 (Braunstein)
smithja@sec.gov
braunsteinj@sec.gov

**Lead Attorneys**
**Attorneys to be Noticed**

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other civil action pending in any court, or of any pending arbitration or administrative proceedings.

Dated:  June 24, 2021

/s James E. Smith _____

James Smith

Joshua Braunstein

Attorneys for Plaintiff

SECURITIES AND EXCHANGE COMMISSION

100 F Street, NE

Washington, DC  20549

Tel: (202) 551-5881 (Smith)

Tel:  (202) 551-8470 (Braunstein)

**DESIGNATION PURSUANT TO LOCAL CIVIL RULE 101.1(f)**

Pursuant to Local Civil Rule 101.1(f), because the Securities and Exchange Commission ("SEC") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as an eligible alternative to the SEC to received service of all notices or papers in the action at the following address:

> David Dauenheimer
> Deputy Chief, Government Fraud Unit
> Assistant U.S. Attorney
> 970 Broad Street
> Newark, NJ, 07102
> Email: david.dauenheimer@usdoj.gov
> (973) 645-2700

Dated: June 24, 2021

> /s James E. Smith
> James Smith
> Joshua Braunstein
> Attorneys for Plaintiff
> SECURITIES AND EXCHANGE
> COMMISSION
> 100 F Street, NE
> Washington, DC  20549
> Tel: (202) 551-5881 (Smith)
> Tel:  (202) 551-8470 (Braunstein)