# EXHIBIT C

# In the Matter Of:

*Securities and Exchange Commission vs*

*Princeton Alternative Funding LLC, et al.*

## *WESLEY MCKNIGHT*

## *January 12, 2023*



**In the Matter Of:**

*SECURITIES AND EXCHANGE COMMISSION vs*

*PRINCETON ALTERNATIVE FUNDING LLC, et al.,*

---

*WESLEY MCKNIGHT VOL 2*

*February 21, 2023*

---



14

1  return all those documents.
2       Q.   Okay.  And we'll get into that.  But so
3  just to clarify that, you did produce documents on
4  January 11th through your counsel in this matter,
5  correct?
6       A.   Yes.  That is true.
7       Q.   And it's your position that you produced
8  all documents you have in your possession that are
9  responsive to that subpoena, correct?
10      A.   Yes.
11      Q.   Like you just mentioned, you were
12 required to destroy all documents concerning Ranger.
13 Do I have that right?
14      A.   That is correct.  Destroyed or returned.
15      Q.   And did you destroy those documents?
16      A.   Yes.  I returned and destroyed those
17 documents -- or returned them.  I destroyed or
18 returned.  Sorry.
19      Q.   And this was pursuant to your employment
20 agreement with Ranger?  Is that right?
21      A.   Per the terms of the employment agreement
22 and the settlement agreement, yes.
23      Q.   Okay.  And can you recall what sort of
24 documents these were?

290

1  Q. And this trip was primarily for the
2  purpose of SEC testimony preparation; is that
3  right?
4           MR. SMITH: Object to the form.
5  A. I don't remember if it was the SEC
6  testimony or if they were going to try to get
7  them back to testify in the arbitration. But it
8  was for one of those. I don't remember
9  specifically which one it was for.
10          MS. MCFARLAND: And I can pull it back
11 up in the deposition if anybody feels that's
12 necessary.
13 Q. But I would represent that it was --
14 the SEC is the current time period I'm talking
15 about for South Dakota.
16 A. Okay.
17 Q. So that being said, can you explain to
18 me Mr. Katsiff's role in the SEC investigation of
19 Ranger?
20 A. Well, it started out by
21 Mr. Wojciechowski's deposition was being taken in
22 the Ballard office. And during one of the
23 breaks, Tim went up to -- Mr. Katsiff went up to
24 Mr. Burgess and Mr. -- one of Mr. Burgess'

291

1  attorneys, and basically -- I kind of came in
2  late to the conversation.  All I heard was Tim
3  basically pointing his finger at him saying, the
4  SEC is going to nail your ass to the wall.  And
5  that's -- from my perception, that's where it all
6  started.
7       After that, Mr. Axelrod had like some local
8  contacts down at the SEC, and I didn't attend any
9  of the trips to the SEC when Mr. Katsiff and
10 Mr. Hacker and potentially others went along.  I
11 just knew that they made several trips and had
12 multiple conversations with the SEC about
13 Princeton.
14      Q.   Who had multiple conversations with the
15 SEC about Princeton?
16      A.   I know -- from my perspective
17 Mr. Katsiff basically took the lead on it.  And
18 he had numerous conversations with them.
19      Nim was involved in those conversations --
20 or Mr. Hacker was involved in those conversations
21 as well, as well as Mr. Axelrod was involved in
22 those conversations.
23      The -- Tim's involvement was where he would
24 tell -- sometimes he'd tell, like, Scott or he'd

292

1  tell myself or other Ranger employees that, like,
2  for example, when Mr. Burgess and
3  Mr. Wojciechowski, and there may have been
4  others, but they had to go to Washington, D.C. to
5  be deposed in front of the SEC.  Mr. Katsiff told
6  me the event was happening.  So like Mr. Katsiff
7  was heavily involved with the SEC and the
8  investigation.
9      Q.   And you mentioned Mr. Axelrod.  Was he
10 also involved in the SEC's investigation into
11 Ranger?
12          MR. SMITH:  Object to the form.
13     A.   Mr. Axelrod had the contacts at the
14 local office.  I think his primary contact, his
15 name was Corey.  I'll remember his last name
16 probably in a little bit.  But that was
17 Mr. Axelrod's primary contact.
18     Q.   Does Corey Schuster refresh your
19 recollection?
20     A.   Yes.
21          MR. SMITH:  Object to the form.
22     Q.   Do you recall about what year this was?
23     A.   That -- those events all started in
24 late '17, right before the arbitration actually

302

1 assistance was given?
2    A.   I believe Mr. Katsiff and Mr. Hacker
3 influenced the whistleblower claim.  To what
4 substance, I don't know.
5    Q.   Do you recall the SEC's inquiry into
6 Ranger in 2018?
7    A.   I don't think that's the right year.
8    Q.   Did it begin in 2017?
9    A.   Yeah.  I believe the year it started
10 was in 2017.
11    Q.   Okay.  And so do you recall the SEC's
12 inquiry beginning in 2017 into Ranger?
13    A.   I do.  I do recall the inquiry in 2017.
14    Q.   Did you have any involvement in -- as
15 to the inquiry?
16    A.   On a limited basis.  There was -- I
17 never saw the formal, like -- I don't believe I
18 saw the formal inquiry.  I think it came from the
19 SEC's Fort Worth office.  I know they came to
20 visit the office.  I was out of the office when
21 they came over, and I don't think I ever directly
22 spoke to them.  I was on a call with them until
23 they basically presented their findings in 2018.
24    Q.   Do you have an understanding as to what

303

1  the SEC was investigating?
2      A.  I don't -- I don't know everything.  I
3  just know from that conference call what they put
4  in their -- at that point, I don't even know if
5  it was a deficiency letter.  I just -- there were
6  basically two main points that came out of their
7  investigation.
8      Q.  Do you recall what those points were?
9      A.  The first one was about the loss
10 reserve methodology and how Gary did that.  They
11 basically disagreed that -- and said we couldn't
12 do it that way.
13     The second one was -- which became a
14 surprise to me, was on how much knowledge Gary
15 had about Princeton and how things weren't going
16 right and how it should have been disclosed to
17 investors.  And when we were trying to raise
18 additional funds, it should have been disclosed
19 to investors.  There's numerous times it
20 mentioned in there communications and things that
21 Mr. Melara had knowledge of.
22     Q.  And you mentioned a call that you were
23 involved with.  What was that call for?
24     A.  It was basically SEC just, I call it --

304

```
 1  I would say presenting us their findings.  And
 2  there were -- there were a couple of people from
 3  the Fort Worth office on there and then there
 4  were multiple Ranger employees on it.
 5       Q.   Was that call in the spring of 2018?
 6       A.   It was.
 7       Q.   And, in your opinion, did Ranger lie to
 8  the SEC?
 9            MR. SMITH:  Object to the form.
10       A.   Yes.
11       Q.   And can you recall what those lies
12  were?
13            MR. SMITH:  Object to the form.
14       A.   From what I recall, the -- Mr. Katsiff
15  was involved in the response.  The -- it was the
16  same -- it was the same narrative back to the SEC
17  and how Ranger wasn't aware of Mr. Burgess'
18  background and him having a felony.  And
19  basically why some of the other evidence that
20  they had found wasn't -- was misinterpreted.
21       And there was a response to the reserve
22  calculation, how basically our auditors had
23  signed off on it.  But that was like -- that was
24  secondary, considering the involvement of
```

305

1 Mr. Melara in not disclosing the details.
2  Q. During the conversation with the SEC,
3 was everybody involved in that conference call
4 disclosed?
5  A. No. I believe -- I believe I testified
6 that this is -- during the beginning of the call,
7 the SEC wanted to basically take a roll call and
8 telling them who was on the phone.
9  Basically Scott Canon -- several of us were
10 in Jay's office, Jay Thompson's office. Scott
11 Canon walks in. And Dana Ousley is sitting there
12 and says, "Oh, wait, Scott Canon also just joined
13 us." And then Jay says, "Oh, but he's leaving,"
14 as Scott is pulling up a chair and sitting down.
15  Q. And did Mr. Canon ever leave?
16  A. No. He attended the entire meeting.
17  Q. Was that disclosed to the SEC?
18  A. It was not.
19  Q. You mentioned the response to the SEC
20 from Ranger. Was that a complete response, in
21 your opinion?
22  MR. SMITH: Object to the form.
23  A. No.
24  Q. Why not?

Wesley Mcknight Vol 2 - February 21, 2023

306

```
 1            MR. SMITH:  Object to the form.
 2       A.   I believe the response was -- it was
 3   misleading.
 4       Q.   Misleading in what way?
 5       A.   To the extent that Mr. Melara was aware
 6   of issues at Princeton and didn't disclose them.
 7       Q.   Would you say that the response was
 8   accurate?
 9            MR. SMITH:  Object to the form.
10       A.   No.
11       Q.   Is that for any other reasons than
12   those that you just gave?
13       A.   At this point, Ranger was -- in my
14   opinion, they were sticking with the narrative
15   that they had with Mr. Burgess, and not knowing
16   about his involvement.
17       Q.   I'm sorry, I lost you.  You said "the
18   narrative."
19       A.   So in my opinion, it was Ranger
20   sticking with the narrative that they didn't know
21   that Mr. Burgess was involved in, with Princeton.
22       Q.   And you may recall from the
23   deposition --
24            MS. MCFARLAND:  I think everybody can
```

Wesley Mcknight Vol 2 - February 21, 2023

310

1  Ranger was intending to mislead the SEC with this
2  response?
3       A.   Yes.
4            MR. SMITH:  Object to the form.
5       A.   Yes.
6       Q.   Thank you.  Earlier, you mentioned
7  David Axelrod.  Can you state who that is?
8       A.   Mr. Axelrod is an attorney for Ballard
9  Spahr.
10      Q.   Did Mr. Axelrod serve as an attorney
11 for Ranger?
12      A.   Yes, he did.
13      Q.   Do you recall when?
14      A.   He started approximately the same time
15 the rest of the Ballard Spahr attorneys did.  It
16 was either the third or fourth quarter of 2017.
17      Q.   Did Mr. Axelrod ever confirm that he
18 could get MicroBilt censored or sued by the SEC
19 as a result of his contacts with the SEC?
20      A.   Yes.  He inferred that.
21      Q.   And Mr. Axelrod was previously employed
22 by the SEC.  Is that right?
23      A.   That's what he said.  Yes.
24      Q.   I apologize.

311

1  A. Bless you.
2  Q. Thank you.
3  Do you recall what Mr. Axelrod said with
4  regard to the type of influence he could have on
5  the SEC?
6  A. Basically, Mr. Axelrod said that he had
7  worked for the SEC, still had close contacts with
8  the SEC, and he thought that he could get them to
9  go after Princeton.
10 Q. Go after Princeton in what way?
11 A. For securities violations.
12 Q. Do you know whether any steps were
13 taken towards going after Princeton?
14 MR. SMITH: Object to the form.
15 A. Yes, there were.
16 Q. What specifically was done?
17 MR. SMITH: Object to the form.
18 A. There -- there were numerous times when
19 I was in the Ballard Spahr office and I know that
20 Tim and David and Nim, they -- they said they
21 were leaving to go down and meet with the SEC.
22 David brokered those introductions. And at least
23 a couple of times where I witnessed, said he was
24 attending those.